UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

CASE NO. 4:20-CR-64-SDJ-KPJ-3

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JUSTIN LUKE MAGNUSON,

        Defendant.
_____/

## MOTION TO REVOKE THE PRETRIAL DETENTION ORDER

The Defendant, JUSTIN LUKE MAGNUSON, by and through undersigned counsel, moves to revoke the pretrial detention order (Dkt. # 83) pursuant to 18 U.S.C. § 3142(g), the Due Process Clause of the United States Constitution, and the Speedy Trial Act of 1974, 18 U.S.C. § 3164. In support thereof, Magnuson states the following:

## BACKGROUND

Magnuson was arrested on August 7, 2020. (Dkt. #80). On August 18, 2020, the Honorable United States Magistrate Judge Christine A. Nowak held a pretrial detention hearing and determined that Magnuson should be detained without bond. (Dkt. #83). Magnuson's former defense counsel then moved to revoke or amend the pretrial detention order (Dkt. #79), which this Court denied based on the factors discussed below.

The case is currently set for Final Pretrial Conference on October 4, 2021. On August 20, 2021, this Court ordered that co-defendants Kevin Conklin, Kenneth Davis, Bradley Schwind, and Anthony Garossino's cases be continued and ordered their trial conference be set for October 4 as well. (Dkt. #237). In that Order, this Court found that "in the interest of justice, this case shall be tried together with all co-defendants." On August 26, 2021, co-defendant Brent McCleod filed an Unopposed Motion for Continuance of Final Pretrial Conference Setting, Trial Setting, and All Pretrial Deadlines for February 2022. (Dkt. #244). On September 2, 2021, co-defendant David Mireles then filed an agreed motion to continue the case 60 days. (Dkt. #246), and on September 10, 2021, co-defendant Clay Magnuson filed a motion to continue the case until February 2022. (Dkt. #250). This Court has not yet ruled on those motions to continue.

Magnuson has been incarcerated since his arrest on August 7, 2020. A trial date of February 2022, six months away (four months from the current setting), means significantly more time in pretrial detention for Magnuson. In light of the co-defendants' motions to continue, Magnuson respectfully requests this Court revoke the pretrial detention order and release him on a significant collateralized bond with the special condition of home confinement for the reasons that follow.

## I. Pretrial Detention Order

Citing facts presented at the pretrial detention hearing by the Government and its witnesses, this Court found evidence requiring detention based on (a) danger to the community (b) the nature and circumstances of the offense charged, (c) the

weight of the evidence against Magnuson, and (d) Magnuson's history and characteristics. 18 U.S.C. § 3142(g). However, in reviewing the Government's discovery, Magnuson has uncovered newly discovered facts which address this Court's concerns. Additionally, Magnuson and his future in-laws are now able to offer collateral which was not offered at the pretrial detention hearing. Based on this new information, Magnuson respectfully requests that this Court revoke or amend the pretrial detention order and release him on bond with strict conditions.

A. <u>Danger to the Community</u>

18 U.S.C. § 3142(g)(4) provides that the Court shall consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." This Court previously found that Magnuson produced evidence sufficient to rebut the presumption that no combination of conditions will reasonably assure his appearance, but not that they will reasonably assure the public's safety. *See Order* at 7. ("The only rebutting evidence referenced in Magnuson's motion is the United States Probation Officer's recommendation that Magnuson be released subject to the conditions in the Pretrial Services report"). Having reviewed the discovery, the defense now rebuts the presumption that no combination of conditions will reasonably protect the public.

This Court articulated three concerns in finding that Magnuson is a danger to the community: (1) the weapons and body-armor found in Magnuson's home, (2) Magnuson's threat to send "muscle," and (3) Magnuson's previous aggravated assault case. First, TFO Slicker testified that guns were found "everywhere" throughout

3

Magnuson's residence (PTD Hearing Transcript p. 31 line 18). Contrary to this assertion, almost every firearm was safely locked away in a gun closet. Magnuson collects firearms as a hobby. All of the firearms were legally purchased. While Magnuson did have a firearm in his bedside table and in the kitchen, the firearms were there because peaceful protests had recently turned to violent riots just outside Magnuson's doorstep. A group of protestors brutally stomped on and kicked a man, who had to be hospitalized, right in Victory Park next to Magnuson's apartment building.[1] Magnuson kept handguns outside of his safe to protect his fiancée, Sarah Stanton, with whom he lived, in the event that rioters attacked his apartment building or reached his apartment. Magnuson's friend and head of security, Jaime Marmolejo, actually advised Magnuson to keep firearms in certain areas of his home, not only to protect Ms. Stanton against rioters but also because Magnuson owns many expensive items, such as jewelry and electronics. In fact, some of the firearms in Magnuson's safe belonged to Mr. Marmolejo. Magnuson is neither a criminal nor dangerous. He has never pointed a gun at or threatened anyone with a firearm. He was simply scared. There is also no allegation that Magnuson used or possessed a firearm in furtherance of a crime of violence or a drug trafficking crime. Furthermore, the Government seized all of Magnuson's firearms, and he will comply with all conditions of bond regarding firearms.

The body armor found in Magnuson's safe, including a vest and the helmet, were actually gifts from Mr. Marmolejo, who served our country as a Marine from

---

[1] https://www.dallasnews.com/news/2020/05/30/protesters-at-dallas-city-hall-say-no-more-and-focus-message-on-police-brutality/

2000-2004. The helmet was the actual helmet Mr. Marmolejo wore overseas. Magnuson collects body armor and kept them in his locked closet to honor his friend. Family members and friends can attest to the fact that Magnuson was a collector. Magnuson never used any of those items against anyone, nor is there any evidence that he intended to do so.

Second, Magnuson never made a threat to any specific person—he was speaking in the hypothetical when he said he could offer muscle. He never planned to actually send any muscle or hurt anyone. In the **_hundreds_** of DEA reports, many of which involve surveillance and other recordings, there is **_no evidence_** whatsoever that Magnuson had such "muscle" to send. Indeed, if the government truly believed he was going to send muscle, it is curious that **_no_** attempt was made to follow up on the threat or see if Magnuson would actually follow-through on his statement. But the threat was **_not_** credible, the Government knew Magnuson was just puffing, and any suggestion to the contrary is belied by the Government's **_own evidence_**. Magnuson owns Med Spas, where customers come to get procedures such as Botox and laser hair removal. It's absurd to suggest that he has muscle to send.

Third, Magnuson received deferred adjudication community supervision for an aggravated assault case 22 years ago. But that case is **_sealed_** and should not have been used against him at the pretrial detention hearing. Government agents searched the locked safe in Magnuson's apartment and found and seized **_all_** of his legal documents, including documents that fall under the attorney-client privilege. The

5

documents are Magnuson's only copies and are no longer in his safe; they were scanned and provided to defense counsel in "Government Production 2."

Within those documents is a *confidential* Order Prohibiting Disclosure of Criminal History Information regarding the aggravated assault case. *See* Exhibit 1. That Order states that Magnuson satisfied the requirements of Sections 411.081(d) and (e) of the Texas Government Code and orders that "criminal justice agencies are prohibited from disclosing to the public criminal history record information related to the defendant's commission of the offense." *Exhibit 1* at 1. The court further ordered that the Crime Records Service of the Department of Public Safety send a copy of the order to "all law enforcement agencies, jails or other detention facilities, magistrates, courts, prosecuting attorneys, correctional facilities, central state depositories of criminal records . . . and to *all central federal depositories of criminal records* that there is reason to believe have criminal history record information that is the subject of this order." *Id.* at 2. Thus, the case should *not* have been used against Magnuson or made public.

Moreover, that case occurred *twenty-two years ago*, when Magnuson was eighteen years old. He is now forty years old. The value of serving a sentence and accepting responsibility for one's crimes is rehabilitation. Magnuson should not be punished over two decades later for something he did when he was 18 years old and for which he accepted responsibility. Notably, Magnuson has had no incidents of violence while imprisoned for the last year. He is also not charged with a violent crime. Magnuson respectfully requests that this Court reconsider the use of a sealed

6

prior case where adjudication was deferred and the action was dismissed and permanently sealed.

B. <u>Nature and Circumstances of the Offense and Weight of Evidence</u>

The Court also considers the nature and circumstances of the offense and weight of the evidence pursuant to 18 U.S.C. §§ 3142(g)(1) and (2). As this Court stated in its pretrial detention order, the weight of the evidence is the least important factor in the detention determination. (Dkt. #92, p. 10) (citing *Stanford*, 630 F. Supp. 2d at 755 (S.D. Tex. 2009); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986); *United States v. Barnett*, 986 F. Supp. 385, 393 (W.D. La. 1997)). In this Court's previous opinion denying Magnuson's motion to revoke bond, the Court cited to Magnuson's alleged role in the offense. (Dkt. #92, p. 9). The evidence, however, does not support such a role.

This investigation dates back to 2010. (PTD Hearing Transcript, p. 17 lines 2-4) but Magnuson was not allegedly involved until almost ***seven years later***. Magnuson could not have been involved so early, as he did not purchase the California properties and meet Christopher London, Ben Hart, and Kelib Thompson until 2017. Magnuson's name is not even mentioned in any DEA or other report until July of 2019.

Next, Magnuson was not the "leader or organizer"—the DEA's own reports refers to the Drug Trafficking Organization as the "Hart DTO" or the "Hart/Thompson DTO," ***not*** the "Magnuson DTO." Magnuson did not store illegal drug proceeds or have meetings regarding drug distribution at his home. Magnuson

7

only stored money that was intended for his legitimate business, It's A Secret Med Spa. The "meetings" at his house were just social visits. Therefore, the nature and circumstances of the offense and weight of the evidence do not weigh in favor of pretrial detention.

C. Magnuson's History and Characteristics

18 U.S.C. § 3142(g)(3)(A) provides that the Court shall consider "the history and characteristics of the person, including – the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." The Court previously considered risk of flight and Magnuson's criminal history. Magnuson is not a risk of flight, has many ties to the community including family and employment ties, and has always complied with court orders.

In finding risk of flight, the Court relied on four facts: (1) Magnuson's statement that he was able to "get to Mexico within two hours if he needs to," (2) the DEA's discovery of Magnuson's go-bag filled with survival gear, amphetamines, a no-spending limit credit card, and a large amount of U.S. currency, (3) Magnuson's multiple residences inside and outside the United States, and (4) Magnuson's ownership of and access to private jets. Magnuson addresses each in turn.

First, Magnuson did not say he could get to Mexico in two hours in the context of fleeing. Rather, in the conversation where he discussed Mexico, Magnuson was talking about how much easier it is flying in his jet to Cabo, Mexico, where he and

8

his fiancée travelled for vacation, than on a commercial plane, because he does not have to wait in security lines, wait for the other passengers to board the plane, deal with flight delays, etc. Indeed, when TFO Slicker was cross-examined on this point at the pretrial detention hearing, he even admitted that Magnuson *never* stated he planned or was prepared to flee to Mexico. (PTD Hearing Transcript, p. 70 lines 7-18). Moreover, the government seized and sold his plane, so he has no access to a private plane to get anywhere in two hours, especially out of the country. The Government already seized Magnuson's passport and Magnuson's fiancée, Ms. Stanton, is willing to surrender her passport as well.

Second, the Government's characterization about the go-bag is misleading. The money and AMEX Black Card were *not* found in the go-bag; the AMEX was found in Magnuson's private safe along with the currency, which was also found in other places in his apartment. Regardless, the fact that Magnuson had a no-spending-limit credit card has no relevance to risk of flight—credit cards can be tracked, so if Magnuson were to use the card at any point while on the run, he could be found instantaneously. Moreover, having a "go-bag" of this sort is not at all unusual; it is very common among hunters, and it is recommended to have such a bag with survival supplies in case of an emergency in states where hurricanes or other natural disasters are common.[2] Magnuson's bag was prepared for that kind of emergency; it also contained a first-aid kit, a toothbrush and toothpaste, and a flashlight. Mr.

---

[2] See, e.g., "What Goes Into a Go-Bag? How to Prepare an Emergency Kit." Associated Press, 2018. https://www.usnews.com/news/healthiest-communities/articles/2018-06-12/what-goes-into-a-go-bag-how-to-prepare-an-emergency-kit.

9

Marmolejo recommended Magnuson have an emergency kit and told him what type of items to keep inside it—Mr. Marmolejo also has a go-bag in his own home for the same purpose.

Nor were the amphetamines nefarious. They were not, as TFO Slicker testified, those that "were used commonly in the past in militaries to keep operators awake." (PTD Hearing Transcript p. 58 lines 7-8). The type of amphetamines which TFO Slicker described is a drug called ***Pervitin***, or methamphetamine hydrochloride. That drug was first synthesized by the Japanese and developed further by the Germans in the early 20th century and was in fact used to keep soldiers awake.[3] The amphetamine that Magnuson possessed, on the other hand, was really just ***Adderall***, which was lawfully prescribed to him by a doctor for ADHD. Ms. Stanton can confirm that Magnuson has been prescribed this medication for at least as long as she has known him (since 2014). Magnuson had more than one bottle of the medication and kept some in his bag in case of an emergency.

Third, the only residence that Magnuson owns outside of the United States is in Costa Rica, a country ***with extradition*** to the United States. Not only can Magnuson not leave the country as he has no passport and no private plane, but the government is also aware of this property. The Government is aware of every residence that Magnuson owns within the United States. If, hypothetically, Magnuson were to flee to one of these locations, the Government would have no trouble finding him and bringing him back to jail. Further, electronic GPS monitoring

---

[3] https://en.wikipedia.org/wiki/History_and_culture_of_substituted_amphetamines#Amphetamines_in_higher_education

would make leaving impossible. Fourth, Magnuson does not have any private plane. He sold the Falcon plane before he was even arrested, and the Government seized and sold his Gulfstream.

Magnuson has no intention of fleeing. Magnuson has significant ties to the community. He is a Texan, born and raised, and is not going anywhere. Before being imprisoned, Magnuson lived with his fiancée, Ms. Stanton, who he was supposed to marry last year (until his arrest). Magnuson's family, Ms. Stanton, and Magnuson's future in-laws have remained very supportive throughout the pendency of Magnuson's case. In fact, his in-laws have offered to put up their primary residence as collateral. Moreover, Magnuson owns It's a Secret Med Spa, which has seven locations throughout Texas and employs over a hundred people.

Magnuson has never disobeyed a court order or failed to show up for court. He fully understands the seriousness of the charges against him and will comply with this Court's orders. He is willing to submit to stringent conditions imposed by this Court, including 24-hour home confinement with an electronic GPS monitor paid for by him. In addition, Ms. Stanton's parents—Dr. Gerald and Donna Stanton—are willing to pledge their home valued at $550,000 as collateral. Magnuson is willing to pledge his high-value Dallas condominium as collateral as well. This was not raised at the original bond hearing. For these reasons, Magnuson is not a flight risk; placing him on home confinement with an ankle monitor would be sufficient to assure his presence in court.

## II. Pretrial Detention Conditions

Section 3142(i) of the Bail Reform Act clearly mandates that defendants being held pretrial must be able to consult with counsel and effectively prepare their defense. "The right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Fed. Defs. Of N.Y. v. Fed. Bureau of Prisons*, 954 F.3d 118, 134 (2d Cir. 2020). *See also, United States v. Salerno,* 481 U.S. 739, 755 (1987) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception").

Magnuson's extended pretrial detention has interfered with his ability to prepare for trial and participate in his own defense. This case involves thousands upon thousands of documents, hundreds of DEA reports, hundreds of audio and video recordings, transcripts, and photos. While his attorneys have been able to meet with him on Zoom, those meetings are only for limited periods at a time and Magnuson cannot properly hear the video and audio files through Zoom. He is only given an hour each day to use the jail computer, and he is not allowed to keep the thumb drive of discovery with his other belongings.

Furthermore, Magnuson has experienced unfair and retaliative conditions while in pretrial detention. In late August, one of Magnuson's attorneys visited Magnuson in the jail for two full workdays. The jail did not bring Magnuson food ***once***

12

during those two visits, even though they said they would. Magnuson has lost thirty pounds since his imprisonment began. On the first day of the attorney visit, Magnuson pressed his button to go to the bathroom, and the staff ignored him for a full hour until his attorney called the jail and requested a staff member come get Magnuson. After that, the staff ignored Magnuson's button altogether—he had to use the button designated for his attorney to get the staff's attention.

Following that attorney visit, after his attorney left, Magnuson was randomly and unjustly strip-searched and thrown into solitary confinement for no reason—the staff originally cited a "commissary violation" but he was never actually written up. The guards also confiscated *all* of his legal documents and folders and searched them. They did not bring him dinner that night and did not let him use the phone to call his attorney until ten minutes before midnight, when jail phone calls end for the night. In the days after he was released from solitary, his attorney Zoom meetings were canceled multiple times without warning.

Magnuson's pretrial detention is not meant to be punitive—he has not been convicted of anything, and he does not deserve to be punished for participating in his own defense. This interference has impeded his ability to interact with his attorneys, and his attorneys' ability to provide effective assistance of counsel. For these reasons in addition to the other reasons discussed herein, Magnuson requests this Court grant his motion for pretrial release.

13

### III. Pretrial Release Pursuant to the Speedy Trial Act

Magnuson should also be granted pretrial release based on the § 3164 of the Speedy Trial Act, which provides that the trial of a person being *detained* pre-trial must commence within *90 days* from the beginning of continuous detention. 18 U.S.C. § 3164(b). "No detainee . . . shall be held in custody pending trial after the expiration of such ninety-day period required for the commencement of his trial." 18 U.S.C. § 3164(c).

Most tolling periods described in 18 U.S.C. § 3161(h) apply to this statute, such as ends-of-justice continuances; however, in the context of pretrial detention, courts interpret these tolling periods differently than the general speedy trial clock, as discussed below. There have been four ends-of-justice continuances in this case, but Magnuson has only been the movant in two of them, the last being on October 30, 2020.[4] The case has since been continued because more defendants were arrested and then arraigned, and those defendants need more time to review discovery and negotiate with the Government. But Magnuson has been in custody the entire time.

Magnuson was arrested on August 7, 2020. This means that as of the current pretrial conference setting on October 4, 2021, Magnuson will have spent *four hundred and twenty-three days* in jail. If the case is continued to February 2022, he will have spent *eighteen months* in pretrial detention. This presents serious

---

[4] August 28, 2020 to December 7, 2020 – ends of justice continuance as to Justin Magnuson and Clay Magnuson (Dkt. #96); October 30, 2020 to April 5, 2021 – ends of justice continuance as to Justin Magnuson, Clay Magnuson, and Jacob Edmonds (Dkt. #112); June 22, 2021 to October 4, 2021 – ends of justice continuance as to David Mireles (Dkt. #195); August 17, 2021 to October 4, 2021 – ends of justice continuance as to Kevin Conklin, Kenneth Davis, Bradley Schwind, and Anthony Garossino (Dkt. #237).

constitutional issues; courts consider the length of pretrial detention in weighing whether continued pretrial detention is warranted. *United States v. Stanford*, 722 F. Supp. 2d 803, 807 (S.D. Tex. 2010), *aff'd*, 394 Fed.Appx. 72 (5th Cir. 2010). Sister circuits have also examined this issue. *United States v. Gonzales Claudio*, 806 F.2d 334, 339–40 (2d Cir. 1986) ("Other circuits have recognized that the length of pretrial detention raises a constitutional issue at some point"); *see also United States v. Portes*, 786 F.2d 758, 768 (7th Cir. 1986); *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986).

The Court cannot continue to hold Magnuson pretrial based on ends-of-justice continuances. The Tenth Circuit found that the lower court's consideration of "(1) the codefendants' need for preparation time; (2) the complexity of the case; and (3) the desirability of trying all defendants at once" in granting an ends-of-justice continuance and thereby tolling the speedy clock was not only improper—it was an **abuse of discretion**. *United States v. Theron*, 782 F.2d 1510, 1512-13 (10th Cir. 1986). In coming to this conclusion, the *Theron* court examined the legislative intent behind the ends-of-justice provision:

> "[F]rom the defendant's point of view, delay is not synonymous with due process. A defendant who is required to wait long periods to be tried suffers from a magnitude of disabilities which in no way contribute to his well being. If he is incarcerated awaiting trial, unnecessary delay in the commencement of the trial could result in irreparable injury to an innocent individual. To one who is ultimately found guilty of a criminal offense, the time spent in detention may represent added time to his ultimate sentence and further retard the rehabilitative process."

H.R.Rep. No. 1508, 93d Cong., 2d Sess. 4, *reprinted in* 1974 U.S.Code Cong. & Ad.News, 7401, 7407-08; *see also*, *United States v. Frey*, 735 F.2d 350, 352 (9th Cir. 1984); *Carrasquillo*, 667 F.2d at 387.

In *Theron*, the defendant was incarcerated for more than four months, and the court found that further prolonging detention would present **serious** constitutional issues. *Theron*, 782 F.2d at 1516. "Although pretrial detention is permissible when it serves a regulatory rather than a punitive purpose, we believe that valid pretrial detention assumes a punitive character when it is prolonged significantly." *Id.* (citing *United States v. Affleck*, 765 F.2d 944, 958-59 (10th Cir. 1985). *See also United States v. Columbo*, 777 F.2d 96 (2d Cir. 1985) (extended pretrial detention may violate due process); *United States v. Lo Franco*, 620 F. Supp. 1324 (N.D.N.Y. 1985) (finding due process violation in case involving 6-months detention and ordering bail); *United States v. Hall*, No. 85-CR-87 (N.D.N.Y. 1985) (same).

Magnuson's pretrial detention has lasted far longer than those of other defendants who have been released under the Speedy Trial Act for constitutional reasons. Although this Court has granted several ends-of-justice continuances, the co-defendants' need to prepare their cases, the complexity of the case, and the desirability of trying all defendants together cannot be the bases for continuing to hold Magnuson pretrial.

Magnuson recognizes that this case is complex and involves many defendants; however, Magnuson is one of only three defendants (out of fourteen defendants total) being detained pretrial. Four of the co-defendants were not arraigned until July of

16

this year. Given the number of defendants, the complexity of the case, and the large amount of discovery, it is certainly understandable that *other* defendants would desire a continuance in order to prepare for trial or engage in plea negotiations[5]—but continuing the case further while Magnuson remains imprisoned an additional four months past the trial setting would be punitive and violate his due process rights. In addition to the reasons for releasing Magnuson on bond described above, Magnuson should be released pursuant to the Speedy Trial Act.

## CONCLUSION

Magnuson is innocent until proven guilty beyond a reasonable doubt, yet he remains imprisoned as though he has already been convicted. Magnuson is not going to flee, and he does not pose a danger to the community. He has demonstrated his good character while in pretrial detention, and his friends and family trust him to do the right thing. A cash bond, pledged collateral, and 24-hour home confinement with electronic GPS monitoring will be more than sufficient to satisfy the considerations under the Bail Reform Act *and* comply with the requirements of the Speedy Trial Act and United States Constitution.

## GOVERNMENT POSITION

On September 13, 2021, Assistant United States Attorneys Heather Rattan and Kevin McClendon advised that the United States Attorney's Office opposed Magnuson's motion for bond.

---

[5] In this Court's most recent order, the Court found that "in the interest of justice, this case shall be tried together with all co-defendants," effectively denying severance. (Dkt. #237).

17

WHEREFORE, based on the foregoing, Magnuson respectfully requests this Honorable Court grant his motion to revoke or amend the pretrial detention order.

Respectfully submitted,

*/s/ Marc David Seitles*
Marc David Seitles
Fla. Bar No. 0178284
mseitles@seitleslaw.com

*/s/ Ashley Litwin*
Ashley Litwin
Fla. Bar No. 0096818
alitwin@seitleslaw.com

*/s/ Alyssa M. Altonaga*
Alyssa M. Altonaga
Fla. Bar No. 1025089
aaltonaga@seitleslaw.com

SEITLES & LITWIN, P.A.
40 N.W. 3rd Street
Penthouse One
Miami, FL 33128
Tel: (305) 403-8070
Fax: (305) 403-8210

*/s/ Richard C. Klugh*
Richard C. Klugh, Esq.
Fla. Bar No. 305294
40 N.W. 3rd Street, PH1
Miami, Florida 33128
Tel. (305) 536-1191
Fax (305) 536-2170
E-Mail rklugh@klughlaw.com

*/s/ Kirk F. Lechtenberger*
Kirk Lechtenberger
Texas Bar No. 12072100
183 Parkhouse Street
Dallas, Texas 75207
(214) 871-1804
kflechlawyer@gmail.com

18

19

## CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2021, undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

<u>/s/ Marc David Seitles</u>
Marc David Seitles